IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SEP 14 2012

CLE... ... ....T
... ......A, ......

GENERAL ASSURANCE OF )
AMERICA, INC., )
    **Plaintiff,** )
)
        v. )
)
OVERBY-SEAWELL COMPANY, )
    **Defendant.** )

Case No. 1:11cv483

## MEMORANDUM OPINION

This dispute between two competing providers of a specialized insurance service arises from a confidentiality and licensing agreement whereby one of the providers agreed to license its proprietary software for administering the service to the other provider. The agreement between the licensor and the licensee further provided that the licensor agreed it would not solicit the licensee's clients and would not disclose the licensee's confidential information concerning those clients. The business relationship between the two providers soured after the successor-in-interest to a major client of the licensee decided to use the licensor, and not the licensee, for the insurance service. Thereafter, the licensee brought the instant action against the licensor alleging breach of contract, breach of fiduciary duty, and tortious interference with contractual relations. The following questions, among others, are presented on the licensor's motion for summary judgment on all of the licensee's claims:

> (i) Whether under Georgia law a non-solicitation covenant and a non-disclosure covenant may be enforced notwithstanding that the covenants are not limited in time;
>
> (ii) Whether Virginia choice-of-law rules governing tort claims require application of the law of the place where the plaintiff's injury was suffered, or instead, the place where the wrongful act occurred;

(iii) Whether under applicable state law a fiduciary relationship exists where, as here, the undisputed material facts establish that the parties were equal in sophistication and bargaining power; and,

(iv) Whether under applicable state law a claim of tortious interference with contractual relations may proceed to trial notwithstanding the absence of record evidence that the defendant acted improperly, maliciously, or without justification.

For the reasons that follow, the licensor's summary-judgment motion must be granted in its entirety, as all of the licensee's claims fail as a matter of law.

## I.

Plaintiff General Assurance of America, Inc. ("GAA") is incorporated under the laws of Virginia and has its principal place of business in Richmond, Virginia. Defendant Overby-Seawell Company ("OSC") is organized under the laws of Georgia and has its principal place of business in Kinnesaw, Georgia. Both companies offer collateral tracking services to banks, which banks use to track the insurance status of collateral in which the bank has a security interest. In particular, these collateral-tracking services provide a participating bank with notice if the holder of any collateral falls behind on paying premiums on the policy insuring the collateral or if the holder ceases insuring the collateral altogether. OSC has its own proprietary software banks can use to administer the collateral-tracking service.

The facts giving rise to the instant action involve three independent insurance agents and three banks. Gil Swaim is an independent insurance agent and a resident of North Carolina. Frank Sutton and John Holmes are principals of Securitas, an insurance agency located in Georgia. Yadkin Valley Bank ("Yadkin Valley") is located in North Carolina and acquired American Community Bank ("ACB"), which at the time of acquisition was also located in North Carolina. Capital City Bank ("Capital City") is located in Tallahassee, Florida, and Macon Bank is located in Franklin, North Carolina.

The Agreements

In late 1999, OSC and GAA entered into the two agreements at issue here: (1) the Confidentiality Agreement and (2) the Software License Agreement, that enabled GAA to use OSC's collateral-tracking software for GAA clients that used GAA's collateral-tracking service. On November 22, 1999, the parties executed an agreement governing the information that GAA provided to OSC (the "Confidentiality Agreement"). The Confidentiality Agreement provides that "OSC will not solicit GAA clients for CPI or other services once identified as clients or potential clients of GAA." (Doc. 1-1). It further provides that "as a condition of GAA furnishing [certain] information, OSC agrees to treat confidentially such information furnished to OSC by GAA or on GAA's behalf." (*Id.*) Less than two weeks after executing the Confidentiality Agreement, the parties signed an agreement describing the conditions under which GAA could use OSC's collateral-tracking software (the "Software License Agreement"). Thereafter, GAA's clients who availed themselves of GAA's collateral-tracking service used OSC's proprietary software to interface with GAA's service.

Yadkin Valley

In early 2009, Yadkin Valley began expressing an interest in outsourcing its collateral tracking requirements to an interested provider. Swaim Dep. 70:1–9. Yadkin Valley had a longstanding relationship with Swaim,[1] who in early 2009 submitted proposals to Yadkin Valley on behalf of three collateral tracking service providers (none of which was GAA or OSC). Swam Dep. 71:15–72:8. Around that time, GAA also pitched its collateral-tracking services to

---

[1] Swaim Dep. 26:10–12, 68:20–69:7.

Yadkin Valley. Levan Dep. 61:11–65:4. Yadkin Valley became the successor-in-interest to

ACB, which had previously relied on GAA for collateral tracking services. Yadkin Valley was

impressed with GAA's proposal and, on April 1, 2009, told GAA that Yadkin Valley had

selected GAA as its collateral tracking service provider. Levan Dep. 71:19–72:16.

In the following months, however, representatives at Yadkin Valley began looking to

companies other than GAA for collateral-tracking services. Levan Dep. 134:22–135:3. It

appears that Yadkin Valley considered GAA's apparent SAS-70 certification[2] to be an important

factor in awarding GAA the collateral-tracking contract, but in March or April of 2009, Yadkin

Valley discovered that GAA's SAS-70 certification actually belonged to OSC. Levan Dep.

76:18–22, 214:5–217:14. Moreover, Kathy Durham at Yadkin Valley stated that she "wish[ed]

we could just lease . . . [OSC's] software," to which Martha Levan at Yadkin Valley responded

that "maybe we need to find out about that." Levan Dep. 79:9–80:2.

At some point before June 2009, Levan told Swaim that Yadkin Valley wanted the "TC

Software," which is a reference to the proprietary software that OSC licensed to GAA. Swaim

Dep. 77:14–78:10. Swaim testified that he was unsure when or how he first learned that GAA

leased OSC's software. Swaim Dep. 53:3–11. Nonetheless, at that time, before June 2009,

---

[2] The SAS-70 certification refers to an external audit that complies with the SAS 70 standard. SAS 70, the Statement on Auditing Standards No. 70, *Service Organizations*, provides "requirements and guidance for CPAs reporting on controls at service organizations." Judith M. Sherinsky, *Replacing SAS 70*, J. of Accountancy, Aug. 2010. SAS 70 certification is important because service organization controls "are relevant to the [service organization's client's] internal control over financial reporting" and a "service organization may engage a CPA to report on controls at the service organization that affect the information provided to [clients] and included in their financial statements." *Id.* Further, external auditors use "SAS no. 70 to report on . . . controls over the privacy of consumers' information." *Id.*

Swaim knew that OSC had this particular software. Swaim Dep. 78:6–10.[3] After Levan mentioned to Swaim that Yadkin Valley was interested in the TC Software, Swaim offered to contact OSC. Levan Dep. 79:9–80:2. Specifically, Swaim asked Yadkin Valley whether Swaim should contact Kistler and Yadkin Valley answered yes. Swaim Dep. 81:4–15. As Levan described the events, "Mr. Swaim didn't reach out to Yadkin Valley and ask Yadkin to purchase Overby-Seawell products," but instead Yadkin Valley "reached out to Mr. Swaim." Levan Dep. 135:13–17.

Pursuant to an invitation by Yadkin Valley, Kistler presented a proposal on behalf of OSC at Yadkin Valley's offices in North Carolina in June 2009. Levan Dep. 75:19–76:13. *See also* Swaim Dep. 77:4–10 (estimating that this presentation took place in May 2009). Swaim denies that OSC provided him with any information regarding the specifics of OSC's presentation to Yadkin Valley prior to that presentation. Swaim Dep. 45:19–46:9. In his presentation to Yadkin Valley, Kistler told Yadkin Valley that "[w]hatever they wanted . . . they could get as far as functionality with the web-based services." Swaim Dep. 67:18–68:6. Afterward, Swaim spoke with representatives from Yadkin Valley, who expressed their "perception once they saw the OSC proposal that there was more that would suit their needs with OSC than with GAA." Swaim Dep. 68:11–19. Indeed, Yadkin Valley later told Swaim that "there was some functionality that they either received or perceived through OSC that was one of the reasons that they picked OSC over GAA." Swaim Dep. 67:10–17.

On September 1, 2009, Yadkin Valley signed a contract with OSC for collateral tracking services. During negotiations among Swaim, Yadkin Valley, and OSC, Yadkin Valley sent OSC

---

[3] Swaim had first learned of OSC through a conversation with Tom Kistler, who had just recently joined OSC, that occurred after Swaim had already made a pitch to Yadkin Valley on behalf of another collateral tracking provider. Swaim Dep. 70:1–71:9.

the contract that GAA had with ACB. Swaim Dep. 122:5–123:1. According to Swaim, OSC received this contract before giving a pricing quote to Yadkin Valley. *Id.* OSC proposed a rate of $.24 per tracked loan, one cent per loan less than provided for in the contract between GAA and ACB. Levan Dep. 234:1–22. Prior to signing the contract, Swaim and Yadkin Valley representatives attended an onsite meeting at OSC's headquarters in Kinnesaw, Georgia. Swaim Dep. 42:5–19 (Doc. 166-1).

Capital City

Sometime in early 2010, Sutton at Securitas contacted Cynthia Pyburn of Capital City regarding collateral-tracking service. Sutton Dep. 111:8–12. Securitas had been pursuing Capital City's business since 2001 and had made at least one sales pitch to Capital City, which considered Securitas to be a "trusted partner." Pyburn Dep. 49:13–50:7. At the time of the contact with Capital City, Securitas had a sub-agent agreement with OSC. During the conversation with Sutton, Pyburn learned that "there was a company out there that [Securitas] could bring to me." Pyburn Dep. 49:19–50:20.

In January 2011, Pyburn "began the process of her thinking about cancelling [GAA] because [GAA] didn't have certain services." GAA Dep. 121:1-4. Indeed, Capital City began exploring OSC because of Capital City's "long-standing issues" with GAA. Pyburn Dep. 100:16-19. Pyburn sent a written request to OSC for a presentation, after which representatives from Securitas and OSC visited Capital City's headquarters in Florida to make a presentation regarding OSC's collateral-tracking services. Pyburn maintains that "GAA was not the reason for the meeting nor the topic of discussion" at the onsite visit in Kinnesaw. Pyburn Dep. 64:1-6. Sutton maintains that all data relied upon in negotiations with Capital City came from Capital City. Sutton Dep. 191:12–192:18. Capital City did not select OSC for collateral tracking and

also sent GAA notice that it was planning to terminate its contract with GAA, although Capital City has yet to cancel that contract. According to Pyburn, the "issue that triggered" Capital City's notice to terminate GAA was, although Pyburn couldn't "remember the exact terms," was that Pyburn "found both Mr. Vass[a]r and Laura Little insistent that we would do business their way." Pyburn Dep. 56:3-8.

Macon Bank

Swaim had a longstanding relationship with Macon Bank and had "provided various insurance products to Macon Bank." Hayes Decl. ¶ 4. At some point, OSC "may have" told Swaim that GAA was a lessee of OSC's TC Software with respect to Macon Bank. Swaim Dep. 43:2–44:16. In fall 2010, Swaim visited Macon Bank's North Carolina office. Accounts differ on whether it was Swaim or a Macon Bank employee who first stated during this visit that Macon Bank was a GAA client. *Compare* Swaim Dep. 44:17–21 (Macon Bank stated this first) *and* Hayes Decl. ¶ 5 ("Swaim told to me that he knew that GAA was providing collateral tracking services to Macon Bank"). Swaim then told Kistler that Macon Bank was a GAA client. Swaim Dep. 44:22–45:2. Kistler responded by discussing the possibility of OSC doing a proposal for Macon Bank and asked Swaim to assess Macon Bank's availability. Swaim Dep. 45:3–8. Subsequently, Swaim (i) invited Macon Bank to visit OSC in Georgia, (ii) offered to pay for Macon Bank employees to travel to OSC's headquarters, (iii) requested another in-person meeting at Macon Bank in North Carolina, and (iv) requested a copy of Macon Bank's contract with GAA.

GAA filed the instant action on May 4, 2011. OSC moved to dismiss or in the alternative transfer the action on the basis of lack of personal jurisdiction and proper venue in Virginia. By Order dated November 15, 2011, this motion was denied. *See Gen. Assurance of Am. v. Overby-*

-7-

*Seawell Co.*, No. 1:11cv483 (E.D. Va. Nov. 15, 2011) (Order). Following the close of the

discovery period, OSC moved for summary judgment on all claims. After oral argument, an

Order issued granting partial summary judgment in OSC's favor on the grounds that (i) the

Confidentiality Agreement's non-solicitation and non-disclosure provisions were void for public

policy under Georgia law for lack of a time limitation, and (ii) the Virginia Business Conspiracy

Act claim fails as a matter of law because Virginia choice-of-law rules select North Carolina and

Florida law. *See General Assurance of Am., Inc. v. Overby-Seawell Co.*, No. 1:11cv483 (E.D.

Va. Jan. 26, 2012). The January 26 Order deferred decision on whether summary judgment was

appropriate with respect to GAA's other tort claims against OSC.

    On March 1, 2012—before issuance of decision on the remainder of OSC's summary-

judgment motion—GAA moved for reconsideration of the January 26 Order's grant of partial

summary judgment. With respect to the breach-of-contract claim, GAA argues that the

Confidentiality Agreement is not akin to an employment agreement, and that the non-solicitation

clause and the non-disclosure clause are not *per se* void for lack of a time limitation.

Alternatively, GAA argues that the Confidentiality Agreement actually does contain a time

limitation and that, in any event, Georgia public policy otherwise supports enforcing the

agreement. With respect to the tort claims, GAA argues that Virginia law does not apply

because GAA was "injured" in Virginia when its clients sent termination letters to GAA in

Virginia and it suffered economic losses in Virginia. Finally, GAA argues that the Virginia

Business Conspiracy Act proscribes OSC's conduct notwithstanding that OSC's allegedly

tortious conduct took place outside Virginia, and that there is a genuine issue of material fact as

to whether OSC acted with legal malice. GAA's reconsideration motion, as well as the

remainder of OSC's summary-judgment motion, have been fully briefed and argued and are now ripe for disposition.

## II.

Summary judgment is appropriate where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The question on summary judgment is "whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant[.]" *In re Apex Express*, 190 F.3d 624, 633 (4th Cir. 1999). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Celotex*, 477 U.S. at 324; *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322.

GAA's motion to reconsider the January 26 Order granting summary judgment is governed under Rule 54(b), Fed. R. Civ. P., which provides that:

> any order or other decision . . . that adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties does not end the action . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

In this regard, "[t]he Fourth Circuit has made clear that where . . . the entry of *partial* summary judgment fails to resolve all claims in a suit, Rule 54[]—not Rule 59(e) or 60(b)—governs a motion for reconsideration[.]" *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 546–47 (E.D. Va. 2010) (citing *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003)). In other words, the January 26 Order was not a final judgment or order,

as it did not decide all the parties' rights and liabilities. Thus GAA, in its reconsideration request "is not required to make a showing of extraordinary circumstances" as would be required under Rules 59(e) and 60(b)(6). *Netscape*, 704 F. Supp. 2d at 547. Instead, the decision to afford relief from the January 26 Order is discretionary and may be exercised "as justice requires." *Touchcom, Inc. v. Bereskin & Parr*, 790 F. Supp. 2d 435, 463 (E.D. Va. 2011) (quoting *Fayetteville Invs. v. Commercial Builders, Inc.*, 936 F.2d 1462, 1473 (4th Cir. 1991)). In short, as GAA correctly argues, the task here in determining whether the January 26 Order properly granted partial summary judgment on GAA's claims "is to reach the correct judgment under law." *Am. Canoe*, 326 F.3d at 515.

## III.

Analysis of GAA's reconsideration motion properly begins with the January 26 Order's grant of summary judgment in favor of OSC on GAA's breach-of-contract claim,[4] which consisted of three theories: (i) OSC solicited GAA's clients, (ii) OSC disclosed confidential information to Swaim and Securitas, and (iii) OSC misused GAA's confidential information by accessing that information for the purpose of assisting OSC's sales pitches of GAA's clients. The January 26 Order concluded these theories all failed as a matter of law, as Georgia law[5]

---

[4] To survive summary judgment on its breach-of-contract claim, GAA must adduce evidence that presents a triable issue of fact on one of the elements of the claim, which under Georgia law are "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent A Car Sys.*, 307 Ga. App. 501, 502, 705 S.E.2d 305 (2010) (citation omitted).

[5] Both parties agree that Georgia law governs this claim because the Confidentiality Agreement's choice-of-law provision expressly calls for application of Georgia law, which by virtue of OSC's Georgia domicile has a reasonable relationship to the parties and to the agreement. *See JDS Uniphase Corp. v. Jennings*, 473 F.Supp.2d 697, 702 (E.D. Va. 2007) (choice of law state is

renders the non-solicitation and non-disclosure provisions invalid for want of a definite time limitation on either provision, and the Confidentiality Agreement does not prohibit "misuse" of GAA's confidential information.[6] Arguing that the conclusion with respect to the non-solicitation and non-disclosure provisions was error, GAA—in a somewhat disjointed fashion—essentially contends (i) that the non-solicitation and non-disclosure provisions are, in fact, time-limited, and (ii) that irrespective of whether these provisions are time-limited, they are nonetheless enforceable under Georgia law. OSC responds that the January 26 Order was correct in its conclusion that these restrictive covenants are unenforceable and in its grant of summary judgment on the entirety of GAA's breach-of-contract claim. Thus, the question presented with respect to the breach-of-contract claim is whether the January 26 Order correctly decided that the non-solicitation and non-disclosure provisions in the Confidentiality Agreement are unenforceable under Georgia law.

To begin with, the non-solicitation and non-disclosure provisions are undoubtedly restrictive covenants in partial restraint of trade under Georgia law. Accordingly these provisions must be analyzed for reasonableness. As embodied in the Georgia Constitution, "[t]he public policy of Georgia is that contracts in restraint of trade are prohibited." *Hostetler v. Answerthink, Inc.*, 267 Ga. App. 325, 328 (2004) (citing Ga. Const. of 1983 art. III, § 6, ¶ 5(c)).

---

reasonably related to the "purpose of the agreement" where the chosen state is a party's domicile) (citing *Hooper v. Musolino*, 234 Va. 558, 566 (1988)).

[6] Although GAA makes reference in its memorandum in support of its reconsideration motion to its "misuse" theory of breach of contract, GAA does not specifically address the January 26 Order's conclusion that the Confidentiality Agreement, by its plain text, contains no express limitation on the circumstances under which OSC access and internally use GAA information stored on OSC servers. The agreement states that GAA's confidential information "will be used for review and evaluation of the CPI or other program(s)" but does not state that such information may be used *only* for these purposes. No provision of the Confidentiality Agreement prohibits OSC from accessing GAA's confidential information and distributing that information within OSC, whatever the purpose of that access or distribution.

Here, the non-solicitation and non-disclosure provisions at issue are not general restraints of trade, which are *per se* unenforceable under Georgia; instead, as GAA correctly notes, these provisions are restrictive covenants in partial restraint of trade.[7] Such a restraint passes muster under Georgia law if "the restraint imposed is [reasonable], is founded on a valuable consideration, and is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public." *W.R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465, 422 S.E.2d 529 (1992).[8] Additionally, "[i]n determining the legality of a restrictive covenant, 'a court may consider the nature and extent of the business, the situation of the parties, and all other relevant circumstances.'" *Murphree v. Yancey Bros.*, 311 Ga. App. 744, 747 (2011) (quoting *Reardigan v. Shaw Indus.*, 238 Ga. App. 142, 143 (1999)).

Any restrictive covenant analyzed for its reasonableness under Georgia law is subject to one of three levels of scrutiny, which "depend[s] generally upon whether the contract at issue is an employment contract, a contract for the sale of a business, or a professional partnership agreement[.]" *Schwartz Investments*, 252 Ga. App. at 368. In this respect, "Georgia courts

---

[7] *Compare Dougherty, McKinnon & Luby, P.C. v. Greenwald, Denzik & Davis, P.C.*, 213 Ga. App. 891, 893 (1994) (concluding that an agreement requiring payment of "a severe penalty, triggered simply by the fact of competition" constitutes a restrictive covenant as it "has the effect of lessening competition"), *with Pregler*, 259 Ga. App. at 150 ("Noncompetition and nonsolicitation covenants against competition contained in employment agreements are in partial restraint of trade."). As the Georgia Court of Appeals has observed, covenants not to disclose confidential information and not to solicit business all involve "a prohibition, or at the very least a limitation, placed by one party on the other party's future business activities." *Schwartz Investments, LLC v. Vion Pharm., Inc.*, 252 Ga. App. 365, 367 (2001) (analyzing as a restrictive covenant a non-circumvention clause that "seeks to limit [the former employee's] right to engage in future transactions with [certain former clients]").

[8] Accordingly, the restrictive covenants such as the non-solicitation and non-solicitation provisions of the Confidentiality Agreement "are scrutinized to determine if they are sufficiently limited in time and territorial effect and are otherwise reasonable, considering the interests to be protected and the effects on both parties to the contract." *Rash v. Toccoa Clinic Med. Assocs.*, 253 Ga. 322, 323 (1984).

divide restrictive covenants into covenants ancillary to an employment contract, which receive strict scrutiny and are not blue-penciled, and covenants ancillary to a sale of business, which receive much less scrutiny." *Northside Hosp. v. McCord*, 245 Ga. App. 245, 247, 537 S.E.2d 697 (2000) (footnotes omitted). In addition, "a middle level of scrutiny has emerged for reviewing professional partnership or professional shareholder agreements." *Advance Technology Consultants, Inc. v. Roadtrac, LLC*, 250 Ga. App. 317, 319 (2001).[9] Although "not every contract falls directly into one of these three categories," Georgia law directs courts to examine "the purposes behind the varying levels of scrutiny to determine which level is most appropriate[.]" *Schwartz Investments*, 252 Ga. App. at 368–69.[10]

Given this framework, it is clear that the non-disclosure and non-solicitation provisions in the Confidentiality Agreement must receive the highest level of scrutiny under Georgia law. In examining a restrictive covenant to determine the appropriate level of scrutiny, "[o]ne starting point is the relative bargaining power of the parties," but importantly, "[a]nother factor . . . is whether there is independent consideration for the restrictive covenant itself." *Schwartz Investments*, 252 Ga. App. at 369. The Georgia Court of Appeals "generally has applied the highest level of scrutiny where the parties have equal bargaining power, but where there is no consideration for the covenant at issue." *Id.* at 370 (citing cases). Here, there appears to be no disparity between the bargaining power of GAA and that of OSC, and the record contains no

---

[9] The basis for applying this middle level of scrutiny, as the *Advance Technology* court observed, is twofold: first, "in such agreements the consideration flows equally among the contracting parties" in that a restriction like a non-solicitation provision is imposed on both parties, and second, the parties enter the agreement "with bargaining power relatively equal to that of the other parties." 250 Ga.App. at 319.

[10] For further discussion of the rationales for the different levels of scrutiny between restrictive covenants ancillary to an employment agreement and restrictive covenants ancillary to a sale of a business, see *Jenkins v. Jenkins Irrigation, Inc.*, 244 Ga. 95 (1979) and *Rash v. Toccoa Clinic Medical Associates*, 253 Ga. 322 (1984).

evidence that OSC received independent consideration for the restrictive covenants in the Confidentiality Agreement. In particular, OSC does not appear to have secured similar restrictions on the part of GAA, and there is no indication that GAA agreed to pay greater licensing fees in exchange for OSC's agreement to the restrictive covenants at issue. Even though GAA likely considered OSC's assent to the restrictive covenants essential to the parties' overall bargain, such a demand as a necessary condition to bargain is characteristic of employment contracts and is therefore quite unlike the consideration involved in partnership agreements or sales of business.[11] In sum, the non-solicitation and non-disclosure provisions in the Confidentiality Agreement must receive the highest level of scrutiny under Georgia law. *See Moore v. Preferred Research, Inc.*, 191 Ga. App. 26, 27 (1989) (noting that licensing agreements are analogous to employment contracts) (citing *Watson v. Waffle House*, 253 Ga. 671, 672 (1985)).[12]

Before the strict scrutiny standard is applied to the restrictive covenants at issue, it must be determined whether the January 26 Order properly concluded that both provisions lack a time

---

[11] Distinguishing between consideration involved in employment contracts and that involved in partnership agreements, the Supreme Court of Georgia explained:

> In a partnership agreement such as the one here, as opposed to an employment agreement, the consideration flows equally among the contracting parties. For example, when an employee agrees to subject himself to possible future restrictions, he does so in exchange for the opportunity to have the job. He really gets nothing other than the opportunity to work in exchange for giving up this aspect of his freedom. On the other hand, here a partner has not only restricted himself, but he has also exacted from each of the other contracting parties a like restriction.

*Rash v. Toccoa Clinic Med. Assocs.*, 253 Ga. 322, 325 (1984).

[12] *See also Roadtrac*, 250 Ga. App. at 320 (identifying "no reason to depart from the historical treatment of the restrictive covenants in this distributorship agreement like covenants ancillary to an employment agreement").

limitation. This conclusion was indeed correct, as GAA's arguments to the contrary are unpersuasive. First, as it did on summary judgment, GAA attempts to rewrite the Confidentiality Agreement to include a time limitation. But, neither the preamble on which GAA relies nor any other part of the Confidentiality Agreement contains a provision either providing for a definite effective duration or detailing the circumstances under which the agreement may be terminated. The parol evidence GAA contends evidences intent to make the Confidentiality Agreement terminable at-will, in addition to being contradictory[13] and somewhat incredible, cannot properly supply a termination clause, which the agreement unambiguously lacks. *See Unifund Fin. Corp. v. Donaghue*, 288 Ga. App. 81, 82–83 & n.4 (2007) (citing Ga. Code § 13-2-2(1) ("Parol evidence is inadmissible to *add to*, take from, or vary a written contract.") (emphasis added)).[14] For these reasons, the January 26 Order was correct in concluding that the non-solicitation and non-disclosure provisions contained no time limitation.

## IV.

The central question presented with respect to GAA's motion to reconsider the January 26 Order's grant of summary judgment on its breach-of-contract claim is whether, under the strict scrutiny standard applicable to the time-unlimited non-solicitation and non-disclosure provisions of the Confidentiality Agreement, these restrictive covenants are reasonable and

---

[13] Indeed, when asked about the procedure for terminating the Confidentiality Agreement, GAA's Rule 30(b)(6) deponent could not define the circumstances under which the agreement and its restrictive covenants could be cancelled. *See* GAA Dep. 214:19-215:17 (testifying that the Confidentiality Agreement's term was "as long as it stayed in force" and that he "probably" "had no understanding how [the agreement] could be cancelled back in 1999").

[14] *See also Waste Mgmt. of Metro Atlanta v. Appalachian Waste Sys., LLC*, 286 Ga. App. 476, 481 (2007) (affirming trial court's conclusion "that it could not add a term missing in the contract"); *Ga. Magnetic Imaging v. Greene County Hosp. Auth.*, 219 Ga. App. 502, 504 (1995) (citation and punctuation omitted) ("It is the function of the court to construe the contract as written and not to make a new contract for the parties.").

therefore enforceable under Georgia law. The enforceability of each of these covenants is addressed in turn.

With respect to the non-solicitation clause, it is clear that covenants not to solicit that are subject to strict scrutiny are enforceable only if strictly limited in time. *See, e.g., Howard Schultz & Assocs. of the Se. v. Broniec*, 239 Ga. 181, 187 (1977) (citing cases for the proposition that time-unlimited restrictive covenants in employment contracts are unenforceable under Georgia law). As explained *supra*, the non-solicitation provision here at issue lacks a time limitation and therefore purports to bind OSC *never* to solicit GAA's clients, even long after a termination of the business relationship between OSC and GAA. Thus, under Georgia law, the non-solicitation provision is overbroad and therefore *per se* "unreasonable and unenforceable[.]" *See Kuehn v. Selton & Assocs., Inc.*, 242 Ga. App. 662, 664 (2000) (declining to enforce a restrictive covenant in an employment agreement that "has the potential to be effective for decades"); *William N. Robbins, P.C. v. Burns*, 227 Ga. App. 262, 264 (1997) (declining to enforce an "attorney agreement [that] contained no limitation regarding duration" and thereby "essentially provided that [the lawyer] could *never* work for any clients who had ever been clients of [his former] firm").

GAA's arguments to the contrary are unpersuasive. The Georgia cases GAA cites holding that an at-will employee may seek compensation for work performed during the employment relationship are plainly inapposite, as none involves the question whether time-unlimited restrictive covenants are enforceable under Georgia law. Moreover, to "blue pencil" the non-solicitation provision to insert a termination provision or otherwise to make it limited in time would be inappropriate because Georgia law does not allow blue-penciling of restrictive covenants receiving strict scrutiny. *See Northside Hosp. v. McCord*, 245 Ga. App. 245, 247

(2000).[15] Finally, GAA's contention that Georgia public policy favors GAA's position begs the question; to the contrary, Georgia law's refusal to enforce time-unlimited restrictive covenants reflects Georgia's firm public policy that such provisions limit commercial competition in ways that Georgia law considers contrary to public policy. Ultimately, GAA cites no case, and none has been found, upholding as enforceable under Georgia law a time-unlimited non-solicitation provision subject to strict scrutiny.

In any event, the record lacks evidence that OSC breached the non-solicitation clause, *i.e.*, that OSC solicited a GAA client in violation of the Confidentiality Agreement. In *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495 (1995), the Georgia Court of Appeals analyzed a non-solicitation clause containing "[t]he phrase 'not to solicit . . . indirectly[.]'" *Id.* at 497. Relying on a dictionary definition of "solicit" to supply the "plain, ordinary and popular sense"[16] of the word, the Georgia Court of Appeals concluded that "[m]erely *accepting* business . . . does not in any sense constitute a solicitation of that business." *Id.* at 497.[17] In this regard, substantial authority holds that for purposes of enforcement of non-solicitation clauses under Georgia law, the distinction between "solicitation" of business and "acceptance" of business turns on which party initiated contact. *See, e.g., Dougherty, McKinnon & Luby*, 213 Ga. App. at 894 (distinguishing "*solicitation* of former [] clients" from "*acceptance*

---

[15] Even assuming, *arguendo*, that the covenants at issue received only mid-level scrutiny, blue-penciling would still be unprecedented, and several cases interpreting Georgia law caution against blue penciling in such a case. *See, e.g., Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 539 (1997) ("Because the covenant does not arise out of the sale of a business, we may not 'blue-pencil' a term which is overbroad to impose a reasonable limit.").

[16] *Id.* at 497 (quoting *Race, Inc. v. Wade Leasing*, 201 Ga. App. 340, 341 (1991)).

[17] To be sure, the court in *Akron Pest Control* found that for one of the parties "to violate the written nonsolicitation agreement at issue would require some affirmative action on his part that could be considered a solicitation *in the broadest possible sense*." 216 Ga. App. at 497.

of any work from such clients regardless of who initiated the contact"); *Am. Control Sys., Inc. v. Boyce*, 303 Ga. App. 664, 670 (2010) (finding no genuine issue of material fact as to former employee's violation of a nonsolicitation agreement given "evidence showing that [the employee] did not induce or solicit [two clients] to leave [the former employer], but that each did so [of] its own initiative" after each had "become displeased with [the employer's] service"); *H&R Block E. Enters. Inc. v. Morris*, 606 F.3d 1285, 1293–94 (11th Cir. 2010) (upholding as enforceable a non-solicitation clause prohibiting a former employee from "'directly or indirectly' soliciting or attempting to solicit" clients, which prohibited the former employee "from *initiating* contact with the employer's clients") (emphasis added) (citing *Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289, 296–97 (1998)).[18] Here, the undisputed facts establish that OSC did not initiate contact with Yadkin Valley, Capital City, or Macon Bank.[19] In the end, GAA cites

---

[18] *Compare Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377 (1982) (noting that the nonsolicitation clause there at issue "prohibits more than the active solicitation or diversion of clients" in that it "prohibit[s the former employee] from accepting employment from a client of [the former employer] who comes to him, without any prior solicitation on his part, and requests that he be their accountant"), *Murphree*, 311 Ga. App. at 749 (concluding that an employee's agreement not to "in any way, directly or indirectly, solicit, divert, or take away, or attempt to solicit, divert or take away" the company's clients "prohibited [the former employee] from initiating affirmative action to compete . . . by *contacting* former customers" but "would not have precluded him from accepting unsolicited business from the forbidden clients") (citation, quotation marks, and footnote call omitted) (emphasis added), *and Whimsical Expressions, Inc. v. Brown*, 275 Ga. App. 420, 423 (2005) (concluding that the employer "failed to show that [the former employee] improperly solicited clients" because the employee "did not solicit those clients, they came to him"), *with Sysco Food Servs. of Atlanta, Inc. v. Chupp*, 225 Ga. App. 584, 587–88 (1997) (concluding that it was "indirect solicitation" for two former employees to have "left [their employer] together" and then "call[] on their former [] accounts personally for several weeks"). Indeed, a nonsolicitation provision that "prohibits not only solicitation of [] former clients, but also the acceptance of business from unsolicited former clients, regardless of who initiated the contact . . . is an unreasonable restraint" under Georgia law. *Waldeck v. Curtis 1000, Inc.*, 261 Ga. App. 590, 592 (2003).

[19] In particular, the undisputed record evidence shows that OSC contacted Yadkin Valley and Capital City only after each of those two banks had expressed to OSC interest in OSC's services, and there is no evidence that Swaim contacted Macon Bank at OSC's direction.

- 18 -

no case—and none has been found—in which a sales pitch made after the customer initiated contact and requested the pitch constitutes solicitation under Georgia law.

Indeed, a construction of the non-solicitation clause that would prohibit OSC from making sales pitches to GAA clients that seek OSC's business or otherwise initiate contact with OSC would be overbroad and therefore unenforceable inasmuch as the provision, so understood, would overprotect GAA's legitimate competitive interests at the expense of the ability of GAA's current and prospective clients to select their preferred services. *See Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 420 (6th Cir. 2006) ("[U]nder Georgia law, nonsolicitation provisions 'may not contain a bar on the acceptance of business from unsolicited clients.'") (quoting *Waldeck v. Curtis 1000, Inc.*, 261 Ga. App. 590, 583 S.E.2d 266 (2003)).[20] If the non-solicitation clause were construed to prohibit OSC from even describing its collateral-tracking services to GAA's existing clients using OSC's software, then OSC would be effectively prohibited from accepting business from these clients who want to continue using OSC's software but are dissatisfied with GAA's service. As a result, the non-solicitation clause, if construed to prohibit OSC's conduct toward Yadkin Valley and Capital City, would unduly limit the ability of GAA's clients to choose the collateral-tracking service they prefer while overprotecting GAA's legitimate competitive interests. *See Singer*, 250 Ga. at 377 (concluding that a covenant that "prohibits more than the active solicitation or diversion of clients . . . constitutes an unreasonable restraint

---

[20] *See also Pregler v. C & Z, Inc.*, 259 Ga. App. 149, 575 S.E.2d 915, 916 (2003) (concluding that "the nonsolicitation clause contained in the agreement is unenforceable because it prevents [the former employee] from accepting business from *unsolicited* clients"); *Orkin Exterminating Co. v. Walker*, 251 Ga. 536, 538 (1983) (noting that a "company cannot prevent [former employees] from merely accepting overtures from those customers").

of trade as it overprotects [the former employer's] interests and unreasonably impacts on [the former employee] and on the public's ability to choose the professional services it prefers").[21]

Finally, even assuming, *arguendo*, that the non-solicitation clause is not unenforceable for lack of a time limitation and that a breach occurred, the non-solicitation clause is nonetheless overbroad for yet another reason, namely that it prohibits OSC from soliciting GAA clients regardless of whether those clients use OSC's software.[22] Thus, because in this respect the non-solicitation provision "unreasonably impacts on . . . the public's ability to choose the business it prefers," it cannot be enforced as a matter of law. *Waldeck*, 261 Ga. App. at 592.

With respect to the non-disclosure provision, the authority on which GAA relies makes clear that the unlimited duration of the non-disclosure provision is not necessarily fatal to that provision's enforceability. For example, in *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, a Georgia federal court sitting in diversity considered whether a time-unlimited non-disclosure provision in a contract governed under Iowa law could be enforced consistent with Georgia public policy. 735 F. Supp. 1545, 1550 (N.D. Ga. 1988). In concluding that the non-disclosure provision at issue there did not run afoul of Georgia public policy notwithstanding that

---

[21] *See also id.* at 475 ("In this case, we find the covenant unreasonable because it overprotects the legitimate interests of [the employer] and unreasonably affects [the employee] by prohibiting him from *accepting* or soliciting work from *any* clients of [his former employer].").

[22] *See W.R. Grace*, 262 Ga. at 467 n.2 ("A prohibition against doing business with *any* of an employer's customers, whether or not a relationship existed between the customer and the former employee, is overbroad" absent a reasonable territorial restriction); *Phys. Specialists in Anethsesia, P.C. v. MacNeill*, 246 Ga. App. 398, 406 (2000) (concluding that an agreement by former partners not "to 'call upon' any of [the partnership's] patients, for any reason, and regardless of whether [the former partners] had treated them . . . is overbroad, even under a reduced level of scrutiny") (citing *Hogan Mgmt. Svcs. v. Martino*, 242 Ga. App. 791, 792 (2000)); *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377 (1982) (invalidating as unreasonable a covenant that "overprotects the legitimate interests of" the former employer "by prohibiting [the former employee] from *accepting* or soliciting work from *any* clients of [the former employer]").

it contained no time limit, the *Salsbury Laboratories* court explained that information constituting a trade secret under Georgia statute or confidential information arising from a fiduciary relationship may receive indefinite protection. *See id.* at 1552–53. To be sure, *Salsbury Laboratories* is inapposite on the issue of the non-solicitation provision's enforceability, as the case's holding and supporting rationales are limited to non-disclosure provisions. Nonetheless, *Salsbury Laboratories* does restate and apply settled Georgia law that the lack of a time limitation is not necessarily fatal to a claim for breach of a non-solicitation provision with respect to trade secrets. *See Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 539 (1997) ("A nondisclosure clause with no time limit is unenforceable as to information that is not a trade secret.").

Ultimately, Georgia law in this respect is unavailing to GAA, as the record is devoid of evidence that OSC actually disclosed any of GAA's trade secrets. GAA's Rule 30(b)(6) deponent cannot identify specifically any confidential information that OSC disclosed in connection with its pitches to Capital City and Yadkin Valley. GAA Dep. 146:1-150:5. The undisputed evidence also establishes that Swaim never revealed any of GAA's confidential information to Macon Bank. The fact that Swaim knew that Macon Bank was a GAA client is immaterial, as this fact does not constitute a trade secret. *Avnet, Inc. v. Wyle Labs. Inc.*, 263 Ga. 615, 617 (1993) (emphasizing that "customers are not trade secrets" because "[k]nowledge on the part of the employee concerning the names and addresses of customers is not the property of the employer"). Although "a 'list of actual or potential customers' *is* a trade secret" that may receive protection under Georgia law independent of an agreement, the record lacks admissible evidence that OSC ever disclosed GAA's customer list. *Id.* at 619 (quoting O.C. Ga. § 10-1-761(4)). The testimony of GAA's Rule 30(b)(6) deponent on this assertion is based exclusively

on out-of-court statements made by Joey Nemeroff, a former OSC employee who was not deposed in this matter. These hearsay statements by Nemeroff, as well as the testimony of GAA's Rule 30(b)(6) deponent about these statements, are clearly inadmissible under Rule 802, Fed. R. Civ. P., and GAA offers no argument supporting their admissibility. Thus, GAA has adduced insufficient evidence that OSC breached the non-disclosure provision by disclosing one of GAA's trade secrets.

To recapitulate, the non-solicitation provisions are unenforceable as a matter of settled Georgia law because (i) they lack a time limitation and (ii) are overbroad in purporting to prohibit OSC from soliciting any GAA customer. Moreover, the record contains no evidence that OSC breached either the non-solicitation and non-disclosure provision. It follows that the January 26 Order correctly granted summary judgment on the breach-of-contract claim, as the claim fails as a matter of law. GAA's reconsideration motion as to this aspect of the January 26 Order is therefore appropriately denied.

## V.

Analysis next proceeds to GAA's reconsideration motion as to the January 26 Order's conclusion that Virginia law does not govern GAA's tort claims. The January 26 Order notes that because the allegedly tortious conduct took place outside Virginia, Virginia choice-of-law rules[23] would not select Virginia law to govern the tort claims. In essence, GAA contends that Virginia law governs because GAA's injuries were suffered in Virginia. A careful examination of Virginia law rules shows that GAA's argument lacks merit, and that the January 26 Order is correct in its conclusion that GAA's tort claims are not governed under Virginia law.

---

[23] There is no dispute that Virginia choice-of-law rules govern the tort claims in this diversity action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

Virginia law selects the place of where the wrongful act occurred and not, as GAA contends, the place where the injury was suffered. It is settled that "Virginia applies the *lex loci delicti*, the law of the place of the wrong, to tort actions[.]" *Milton v. ITT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998) (citing *Jones v. R.S. Jones and Assoc.*, 246 Va. 3 (1993)). And Virginia law defines a "tort" as "any civil wrong or injury; a wrongful act[.]" *Buchanan v. Doe*, 246 Va. 67, 71 (1993) (citation omitted). Accordingly, "Virginia's choice of law rule selects the law of the state in which the wrongful act took place, wherever the effects of that act are felt." *Milton*, 138 F.3d at 522. Put another way, "[t]he place of the wrong . . . is defined as the place where the last event necessary to make an act liable for an alleged tort takes place." *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (citation and internal quotation marks omitted). Given this, GAA is incorrect in asserting that the place of the injury, rather than the place of the wrong, controls the application of Virginia choice-of-law rules. Indeed, it is under Maryland law, not Virginia law, that "the place of the tort is considered to be . . . the place where the injury was suffered, not where the wrongful act took place." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986) (interpreting Maryland choice-of-law rules).[24] Although both states "recognize the doctrine of *lex loci delicti*," "Maryland and Virginia courts differ in their discussion of the doctrine in [this] critical respect[.]" *Mainstreet Bank v. Nat'l Excavating Corp.*, 791 F. Supp. 2d 520, 530–31 (E.D. Va. 2011). In sum, GAA's claims are governed by the law of the place where OSC's allegedly tortious conduct took place, irrespective of where GAA sustained the injury.

Given this, the January 26 Order correctly concluded that under Virginia choice-of-law rules, the place of the wrong, *i.e.*, the place of the last event necessary to complete an alleged

---

[24] Cited in *Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 937 (E.D. Va. 1998).

tort, is the place where OSC's alleged interference with GAA's client relationships took place. *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 280 n.6 (4th Cir. 2009) (observing in a civil-conspiracy action that "'the last event necessary to make an act liable for an alleged tort' . . . would be [the defendant's] hiring of [the plaintiff's former employee]") (quoting *Quillen*, 789 F. 2d at 1044; *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, No. 3:05cv355, 2006 WL 5908727, at \*7 (E.D. Va. Feb. 10, 2006) (applying the law of the state where "the acts of solicitation that led to" plaintiff's economic damages occurred), *aff'd*, 230 F. App'x 328 (4th Cir. 2007); *X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 640 (E.D. Va. 2001) (concluding under Virginia choice-of-law rules that communications allegedly involving wrongful disclosure and misuse of information "occurred only in Illinois and North Carolina" and that "[a]s such, Illinois and North Carolina law, not Virginia law, shall apply to the misappropriation of trade secrets claim").[25] As the January 26 Order noted, because the alleged harmful contact between OSC and GAA's clients occurred where each of those clients was located at the time, the law of the state of each client's location

---

[25] *See also, e.g., Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (concluding "[u]nder the rule of lex loci delicti, Massachusetts law, the situs of the crash, applies to the analysis of the claims for negligence, strict liability, and breach of express and implied warranties"); *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) (applying Kentucky law under Virginia choice-of-law rules given that "incidents underlying [the plaintiff's tort] claims occurred in the Cincinnati airport located in northern Kentucky"); *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 914 n.4 (E.D. Va. 2004) (applying Virginia law in a defamation action "because all statements at issue in this case were allegedly published in Virginia"); *Kraft Foods N. Am., Inc. v. Banner Eng'g & Sales, Inc.*, 446 F. Supp. 2d 551, 567 (E.D. Va. 2006) (applying Virginia law in a negligence action where "allegedly wrongful act in this case was [the defendant's] delivery of a negligently designed impedance pipe heating system" to a facility in Virginia); *Gov't of Dom. Rep. v. AES Corp.*, 466 F. Supp. 2d 680, 693 (E.D. Va. 2006) (concluding "under Virginia choice of law principles, that the law of the Dominican Republic applies to Plaintiff's nuisance, civil conspiracy, and aiding and abetting claims because the place of injury occurred where the coal ash was dumped in the Dominican Republic").

governs claims alleging damage to the relationship with that client.[26] It follows that the January 26 Order was correct in concluding that North Carolina law applies to claims alleging harm to GAA's relationship with Yadkin Valley and Macon Bank, while Florida law applies to claims alleging harm to GAA's relationship with Capital City.

The cases on which GAA relies actually support the result reached here that Virginia choice-of-law rules require application of the law of the place where the last act completing the tort occurred, regardless of where the effects of the tort were felt. Each of these cases involved a claim for fraud, which as an element requires a demonstration of the plaintiff's reliance. And in each case, the place of reliance—which completes the fraud tort—happened to be the place of the plaintiff's domicile. *See, e.g., Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 713-14 (E.D. Va. 2009) (last event completing the tort was plaintiff's reliance in Virginia).[27] Moreover, GAA's argument that Virginia law governs on the basis of damages felt by GAA in Virginia has been soundly rejected. *See Milton v. ITT Research Inst.*, 138 F.3d 519, 521–22 (4th Cir. 1998) (declining to adopt "the novel conclusion that because [the plaintiff] resides in Virginia the effects of the damages he alleges . . . actually occur in Virginia, making that state the *loci delicti*, or place of the injury") (citing *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979)

---

[26] GAA's contention that its receipt of termination letters in Virginia was the last act giving rise to a tortious-interference claim is clearly wrong, as the place where the client made the decision to terminate GAA is dispositive. *See Mullins v. Int'l Union of Operating Eng'rs No. 77 AFL-CIO of Wash., D.C.*, 214 F. Supp. 2d 655, 665–66 (E.D. Va. 2002) (concluding that the tort in a wrongful-termination action occurred in Maryland because "[t]he termination was effected by [the employer] in Maryland" and noting that "it is immaterial that [the employee] happened to be in Virginia when she called [the employer] to receive notice of termination").

[27] *See also Cars Unlimited II v. Nat'l Motor Co.*, 472 F. Supp. 2d 740, 749–50 (E.D. Va. 2007) (same); *Insteel Indust., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003) (last event completing the tort was plaintiff's reliance in North Carolina); *AvalonBay Communities, Inc. v. Willden*, No. 1:08-cv-777, 2009 WL 2431571, at *6 n.5 (E.D. Va. Aug. 7, 2009) (last event completing the tort was plaintiff's reliance in Virginia).

(declining to adopt the "most significant relationship" test set forth in the *Restatement (Second) of Conflicts of Laws* §§ 145 & 169 (1971))). Thus, GAA's argument that Virginia law governs the tort claims is unpersuasive.[28]

Application of this choice-of-law framework to GAA's claim that OSC violated the Virginia Business Conspiracy Act firmly supports the correctness of the January 26 Order's conclusion that because none of the acts on which the claim arises occurred in Virginia, the claim fails as a matter of law. Indeed, a contrary conclusion would offend the longstanding rule that "the laws of one State have no operation outside of its territory[.]" *Pennoyer v. Neff*, 95 U.S. 714, 722 (1877) (citation omitted). As the Fourth Circuit has observed, "[t]his rule reflects core principles of constitutional structure," including "the autonomy of individual states within their respective spheres" and "the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce." *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am, Inc.*, 492 F.3d 484, (4th Cir. 2007) (citations omitted). Here, GAA has adduced no evidence that the activity giving rise to its business-conspiracy claim, *i.e.*, OSC's communications with Yadkin Valley in North Carolina, Capital City in Florida, or Macon Bank in North Carolina, ever occurred in Virginia. Thus, because the Constitution "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," the Virginia Business Conspiracy Act is powerless to proscribe commercial activity allegedly constituting a business conspiracy where,

---

[28] A contrary conclusion "would effectively replace Virginia's traditional rule for tort cases with default application of the law of plaintiff's domicile[.]" *Milton*, 138 F.3d at 522.

- 26 -

as here, that activity took place entirely outside Virginia. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335 (1989).[29] The January 26 Order's grant of summary judgment was therefore appropriate.

In sum, GAA's motion to reconsider the January 26 Order's grant of summary judgment on the breach-of-contract and business-conspiracy claims lacks merit for the reasons stated. Additionally, GAA's argument that Virginia law applies to its tort claims is unpersuasive. Thus, it is appropriate to deny GAA's reconsideration motion in its entirety.

## VI.

Analysis next proceeds to OSC's motion for summary judgment with respect to the remaining tort claims. GAA alleges that independent of its obligations arising from the Confidentiality Agreement,[30] OSC's conduct with respect to several independent insurance agents and three GAA clients—Yadkin Valley, Capital City, and Macon Bank—constituted a breach of OSC's fiduciary duties to GAA and also constituted tortious interference with GAA's contracts. OSC responds that it never owed any fiduciary duties to GAA, and that any interference with GAA's contracts was justified as a matter of law.

---

[29] *Accord Bigelow v. Virginia*, 421 U.S. 809, 822–23 (1975) ("The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State.").

[30] Worthy of mention is recent Virginia authority holding that Virginia recognizes no cause of action for a tort if the duty on which the tort is premised arises from a contract between the parties. *See Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 208 (2007) (noting that "[a]ny fiduciary duty allegedly breached in this case existed solely because of the contractual relationship" and thereby holding that the plaintiff "failed to assert a valid claim for breach of fiduciary duties"). Moreover, it appears that because this principle of law is one of Virginia's choice-of law rules rather than of Virginia substantive law governing specific causes of action, it controls here notwithstanding that GAA's tort claims are governed under North Carolina and Florida law. *See id.* at 207–08 ("If the cause of complaint be for an act of omission or nonfeasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action . . . then the action is founded upon contract, and not upon tort.") (quoting *Oleyar v. Kerr*, 217 Va. 88, 90, 225 S.E.2d 398, 399 (1976)). Nonetheless, as the tort claims fail as a matter of law for other reasons set forth *infra*, this issue need not be decided.

The legal sufficiency of the breach of fiduciary duty claim will be addressed first. North Carolina law, which governs the claim with respect to OSC's conduct toward Yadkin Valley and Macon Bank, defines a fiduciary relationship as "one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and due regard to the interests of the one reposing confidence[.]" *Dalton v. Camp*, 353 N.C. 647, 651 (2001) (citation and internal quotation marks omitted). Such a relationship "extends to any possible case . . . in which there is confidence reposed on one side, and *resulting domination and influence on the other*." *Id.* (emphasis in original) (citations omitted). Given this, "a fiduciary relationship is not created 'between mutually interdependent businesses with equal bargaining positions who dealt at arms-length.'" *Cardiovascular Diagnostics Inc. v. Boehringer Manheim Corp.*, 985 F. Supp. 615, 619–20 (E.D.N.C. 1997) (quoting *Frizzell Constr. Co., Inc. v. First Citizens Bank & Trust Co.*, 759 F. Supp. 286, 290 (E.D.N.C.1991). Indeed, "[o]nly when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613 (2008) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998)).

The record makes clear that this is not such a circumstance, as there is no evidence that OSC exercised dominating influence over GAA, or that there was a disparity in sophistication between them. To the contrary, GAA acknowledges that the Confidentiality Agreement "was entered into by two parties with equal bargaining power." GAA Summ. J. Opp'n 13. The record makes clear that GAA and OSC were sophisticated businesses that relied on their own independent business judgments in arranging for OSC to license its collateral-tracking software

- 28 -

to GAA. Moreover, the record clearly shows that OSC and GAA independently pursued their own separate business objectives, and that OSC provided assistance to GAA only in situations in which OSC stood to benefit. Thus, because the record evidence fails to support the existence of a fiduciary relationship between GAA and OSC, the breach of fiduciary duty claim fails with respect to Yadkin Valley and Macon Bank.[31] *See Cardiovascular Diagnostics*, 985 F. Supp. at 620 (declining "to find a fiduciary relationship inherent in a license agreement" and dismissing breach of fiduciary duty claim where the agreements there at issue "were negotiated at arms-length and were entered into willingly by the parties on equal footing"); *S.N.R. Management*, 189 N.C. App. at 613–14 (affirming dismissal of breach of fiduciary duty claim where plaintiff failed to allege facts showing that defendant had the "amount of control and domination required to form a fiduciary relationship outside that of the normal relationships recognized by law") (quoting *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)).

Similarly, there is insufficient evidence of a fiduciary relationship between GAA and OSC under Florida law, which requires that a plaintiff adduce evidence of "some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. App. 3d Dist. 1993) (internal quotation and citation omitted). Where, as here, "the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other." *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. App. 5th Dist. 2003). Thus, GAA has failed to adduce evidence sufficient to support the existence of an implied fiduciary duty under Florida law, which in turn

---

[31] The same result would obtain under Virginia law. *See PRC Realty Sys., Inc. v. Nat'l Assoc. of Realtors, Inc.*, 766 F. Supp. 453, 461 (E.D. Va. 1991) (holding that "[n]o fiduciary duty is involved" where, as here, an agreement "between the parties was negotiated at arm's length" and neither party "imposed any trust in the other beyond that called for by the contracts").

requires granting OSC's summary-judgment motion as to this claim. *See Thunder Marine, Inc. v. Brunswick Corp.*, 277 F. App'x 910, 913 (11th Cir. 2008) (per curiam) (concluding that plaintiff had "failed to proffer sufficient indicia of" the following conditions precedent to a fiduciary duty under Florida law: (i) plaintiff's "dependency" on defendant, (ii) "a disparity of savviness" between plaintiff and defendant, and (iii) "an acceptance by [defendant] of a duty to counsel or otherwise protect [plaintiff]").

In sum, the record contains insufficient evidence on which a jury could conclude that OSC owed fiduciary duties to GAA. As a result, the breach of fiduciary duty claims, as well as the accounting request and constructive trust claims, fail as a matter of law. It is therefore appropriate to grant OSC's motion for summary judgment on these claims.

## VII.

Finally, OSC seeks summary judgment on GAA's claim for tortious interference with contractual relations. In opposition to summary judgment, GAA argues with respect to Yadkin Valley and Capital City that the record contains sufficient evidence supporting its claim that OSC improperly induced these two GAA clients to decline to renew their collateral-tracking agreements with GAA. GAA further argues with respect to Macon Bank that although Macon Bank remains a GAA client, OSC is liable to GAA for GAA's costs incurred in keeping Macon Bank as a client after Swaim approached Macon Bank regarding OSC's collateral-tracking service. OSC responds that Macon Bank's continuing status as a GAA client precludes any liability to GAA for tortious interference, and that the claim as to Yadkin Valley and Capital City fails for lack of evidence that the interference was unjustified or malicious.

Under North Carolina law, which governs the tortious-interference claim with respect to

Yadkin Valley and Macon Bank, a plaintiff must "forecast evidence of the following elements"

of tortious interference with contract:

> First, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. Second, that the outsider had knowledge of the plaintiff's contract with the third person. Third, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. Fourth, that in so doing the outsider acted without justification. Fifth, that the outsider's act caused the plaintiff actual damages.

*Varner v. Bryan*, 113 N.C. App. 697, 701 (1994) (quoting *Childress v. Abeles*, 240 N.C. 667, 674

(1954)). Given this, the claim necessarily fails as a matter of law with respect to Macon Bank

for lack of evidence of inducing non-performance, as Macon Bank remains a GAA client. With

respect to Yadkin Valley, "[i]n order to demonstrate the element of acting without justification,

the action must indicate 'no motive for interference other than malice.'" *Area Landscaping,*

*L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 523 (2003) (quoting *Filmar Racing, Inc. v.*

*Stewart*, 141 N.C. App. 668, 674 (2001)). In this respect, "[t]he plaintiff's evidence must show

that the defendant acted without any legal justification for his action." *Varner*, 113 N.C. App. at

702 (citing *Childress*, 240 N.C. at 675).[32] Accordingly, "[a] defendant may encourage the

termination of a contract 'if he does so for a reason reasonably related to a legitimate business

interest.'" *Area Landscaping*, 160 N.C. App. at 523 (quoting *Robinson, Bradshaw & Hinson v.*

*Smith*, 129 N.C. App. 305, 318 (1998)). In general, "interference with contract is justified if it is

motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider,

are competitors." *Sellers v. Morton*, 191 N.C. App. 75, 82 (2008) (quoting *Embree Constr.*

---

[32] *See Griffin v. Holden*, 180 N.C. App. 129, 140 (2006) ("Even if plaintiff shows that defendant acted with ill intentions, legal malice does not exist unless plaintiff can show that defendant had no legitimate business justification for the interference.").

*Group v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992)). In other words, "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221 (1988).[33]

In view of the entire record, it is clear that GAA's tortious-interference claim with respect to Yadkin Valley fails given the lack of record evidence that OSC acted maliciously or otherwise without justification. The undisputed facts establish that OSC sought to provide collateral-tracking service to Yadkin Valley only after Yadkin Valley had become dissatisfied with GAA and only after Yadkin Valley had sought OSC's business. In this respect, it cannot be said that OSC acted without justification. *Area Landscaping*, 160 N.C. App. at 523–24 (affirming grant of summary judgment where plaintiff "failed to present evidence that [defendant] acted without justification" given that defendant's contract bid "was a legitimate business interest and indicates a non-malicious motive for their 'interference'"). Despite GAA's contention to the contrary, GAA and OSC were at all times competitors in the collateral-tracking industry because each offered its own collateral-tracking service and, as explained *supra*, nothing in the Confidentiality

---

[33] This is so because, as the Supreme Court of North Carolina has put it,

> Competition . . . is the life of trade. Every act done by a trader for the purpose of diverting trade from a rival, and attracting it to himself, is an act intentionally done, and, in so far as it is successful, to the injury of the rival in his business . . . . To hold such an act wrongful and illegal would be to stifle competition. Trade should be free and unrestricted; and hence every trader is left to conduct his business in his own way, and cannot be held accountable to a rival who suffers a loss of profits by anything he may do, so long as the methods he employs are not of a class of which fraud, misrepresentation, intimidation, coercion, obstruction, or molestation of the rival or his servants . . . are instances.

*Peoples Security Life Ins. Co.*, 322 N.C. at 223 (quoting *Macauley Bros. v. Tierney*, 19 R.I. 255, 256 (1895)).

Agreement or the Software License Agreement prevented OSC from offering its own competing collateral-tracking service to GAA's clients as long as OSC did not solicit those clients or disclose GAA's confidential information in the process. *See S.N.R. Management*, 189 N.C. App. at 615 (concluding that "plaintiff and [defendants] were competitors and as such, [defendants'] actions were justified"). Moreover, GAA has forecasted no evidence that OSC ever made misrepresentations about GAA to its customers, or that GAA was ever on a "hit list." *See Combs v. City Elec. Supply Co.*, 203 N.C. App. 75, 85 (2010). Nor is there any evidence that OSC acted out of spite or ill will toward GAA. *See Barker v. Kimberly-Clark Corp.*, 136 N.C. App. 455, 463 (2000). In sum, GAA has adduced no evidence that OSC acted maliciously or without justification in its contacts with Yadkin Valley.[34]

Finally, analysis proceeds to whether summary judgment on the tortious-interference claim is appropriate with respect to OSC's conduct toward Capital City. Under Florida law, the elements of tortious interference with a contract or business relationship comprise the following:

> (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and (4) damage to the plaintiff resulting from the third person's failure to perform.

*Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. App. 4th Dist. 2001). As to the third element of intentional and injustified interference, "[i]t is only when malice is the *sole* basis for interference that it will be actionable." *McCurdy v. Collis*, 508 So. 2d 380, 383 (Fla. App. 1st Dist. 1987) (citing *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1225–26 (Fla App. 3d

---

[34] *See Varner*, 113 N.C. at 702 (affirming grant of summary judgment on a tortious-interference claim even though "plaintiff was terminated by defendants for personal or political reasons" because "such termination was neither a wrongful act nor one in excess of defendants' authority and therefore not legally malicious").

Dist. 1980)). Thus, "[a] person who interferes with the business relations of another with the motive and purpose, at least in part, to advance [or protect] his own business [or financial] interests, does not interfere with an improper motive." *McCurdy*, 508 So. 2d at 383 n.2 (quoting Fla. Standard Jury Instruction (Civil) MI 7.2)). Put another way, "so long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable." *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1225 (Fla. App. 3d Dist. 1980).

In light of these standards under Florida law, GAA's tortious-interference claim with respect to Capital City fails in two respects. First, GAA has adduced no evidence that OSC's conduct toward Capital City was cause of Capital City's decision not to renew its agreement with GAA. Indeed, the only record evidence of the reason for Capital City's decision in this regard concerns Capital City's dissatisfaction with GAA. *See, e.g.*, GAA Dep. 121:1-4 (acknowledging that Pyburn "began the process of her thinking about cancelling [GAA] because [GAA] didn't have certain services"); Pyburn Dep. 100:16-19 (testifying about Capital City's "long-standing issues" with GAA); *id.* 56:3-8 (testifying that the "issue that triggered" Capital City's notice to terminate GAA was that Pyburn "found both Mr. Vass[a]r and Laura Little insistent that we would do business their way"). Notably, the undisputed fact that Capital City did not decide to use OSC for collateral tracking casts substantial doubt on GAA's assertion that Capital City's termination of GAA had anything to do with OSC. Even if Capital City's dissatisfaction with GAA would not have occurred but for OSC's overtures, this record presents no reasonable basis for the conclusion that any access or use of GAA's confidential information by OSC caused that dissatisfaction. Furthermore, there is no evidence that during OSC's negotiations with Capital City, OSC ever disparaged GAA or disclosed GAA's confidential information to Capital City,

and Securitas and OSC maintain that they used none of GAA's confidential information in their negotiations with Capital City.[35]

Second, the record is devoid of evidence that OSC employed improper methods in its interactions with Capital City.[36] The two respects in which GAA contends OSC's conduct toward Capital City was improper—breaches of a fiduciary relationship and misuse of confidential information—cannot support GAA's allegation of impropriety because, as explained *supra*, OSC owed no fiduciary duty to GAA and the record contains no evidence that OSC's interactions with Capital City involved misuse of GAA's confidential information. Thus, OSC's summary-judgment motion as to GAA's tortious interference claim is appropriately granted.

## VIII.

For the reasons stated, GAA's claims against OSC for breach of contract, breach of fiduciary duty, constructive trust, accounting, and tortious interference with contractual relations all fail as a matter of law. It is therefore appropriate to deny GAA's motion to reconsider the January 26 Order and also to grant OSC's motion for summary judgment in its entirety.

An appropriate order will issue.

Alexandria, Virginia
September 14, 2012

/s/ T. S. Ellis, III
T. S. Ellis, III
United States District Judge

---

[35] The record does not make clear the purpose for which OSC accessed GAA's pricing for Capital City in early 2010, but even if that access constituted a breach, there is no evidence that this particular breach was the proximate cause of Capital City's decision not to renew with GAA.

[36] For a discussion of the rationales for strictly limiting what constitutes "improper methods" under Florida law, see *GNB, Inc. v. United Danco Batteries, Inc.*, 627 So. 2d 492, 495 (Fla. App. 2d Dist. 1993) (Altenbernd, J., dissenting) (opining that "the supreme court rarely intends the concept of improper business methods to be expanded to include acts that are neither independently tortious nor proscribed by statute" and that the "narrow tort" of tortious interference with contractual relations "should protect business enterprises from only exceptional, intentional business practices that clearly involve unjustifiable motive or conduct").